IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **ASSOCIATION OF O&C COUNTIES**, 16289 HWY 101 South Ste. A, Brookings OR 97415, | ) ) ) | Civil No. 1:17-cv-0280 |
| | ) | Action for Declaratory and Injunctive |
| Plaintiff, | ) ) | Relief to Remedy Violations of the Oregon and California Railroad Lands Act of 1937, |
| v. | ) ) | 43 U.S.C. § 1181a; and the Antiquities Act of 1906, 54 U.S.C. § 320301 |
| | ) | |
| **DONALD J. TRUMP**, in his official capacity as President of the United States of America, 1600 Pennsylvania Avenue NW Washington, DC 20500;  **UNITED STATES OF AMERICA**; **KEVIN HAUGRUD**, in his official capacity as acting Secretary of the Interior, U.S. Department of the Interior, 1849 C Street NW, Washington, DC  20240; and **BUREAU OF LAND MANAGEMENT**, 1849 C Street NW, Washington, DC  20240, | ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |

## COMPLAINT

Plaintiff Association of O&C Counties ("AOCC" or "Plaintiff") for its complaint against

Defendants Donald J. Trump, in this official capacity as President of the United States of

America; the United States of America; Kevin Haugrud, in his official capacity as Acting

Secretary of the Interior ("Secretary"); and the Bureau of Land Management ("BLM") states and

alleges as follows:

## I.  INTRODUCTION

1.      This case arises out of President Barack Obama's Proclamation issued on January

12, 2017 ("Proclamation 9564"), expanding the boundaries of the Cascade-Siskiyou National

Monument pursuant to the Antiquities Act, 54 U.S.C. §§ 320301-320303.  Proclamation 9564 adds approximately 48,000 acres to the existing Cascade-Siskiyou National Monument. Proclamation 9564 states that the Secretary will manage the lands through the BLM as a unit of the National Landscape Conservation System, under the same laws and regulations that apply to the rest of the monument.  Those laws and regulations include a blanket prohibition on commercial timber harvest inside the monument.

2.  Of the 48,000 acres set aside for the monument expansion, approximately 40,400 of those acres *have already been set aside* by Congress for a special purpose in the Oregon and California Railroad Grant Lands Act of 1937 ("O&C Act"), 43 U.S.C. §§ 1181a-1181f.  The federally-owned lands governed by the O&C Act (the "O&C Lands") serve a particular purpose.  In particular, Congress mandated that  all of the O&C Lands classified as timberlands "shall be managed" for the purpose of "permanent forest production" on a sustained yield basis and required that at least 50 percent of the proceeds from the timber sales on such lands shall be paid to local county governments.  Congress entrusted the Secretary to manage these O&C Lands, but with an express mandate:  the timber "shall be sold, cut, and removed in conformity with the principal of sustained yield."  43 U.S.C. § 1181a.  Furthermore, to ensure adequate revenues to the counties, Congress expressly mandated that the amount of timber sold each year from the O&C Lands shall not be less than one-half billion board-feet or the annual sustained yield capacity of those forests.  *Id*.

3.  President Obama's inclusion of O&C Lands within the Cascade-Siskiyou National Monument violates the O&C Act and exceeds the scope of presidential authority under the Antiquities Act.  Where Congress has set aside lands for a specific purpose, the President is

without authority to reserve those lands for another purpose.  Congress set aside O&C Lands for sustained yield timber production for the benefit of counties in Oregon.  The President may not, therefore, reserve those lands for a monument that *prohibits* the very sustained yield timber production for which the same lands were previously set aside by Congress.  As a result, the President's inclusion of O&C Lands in Proclamation 9564 must be set aside as *ultra vires*.

## II.  JURISDICTION AND VENUE

4.      The Court has jurisdiction of this action pursuant to 28 U.S.C. § 1331 (federal question) and 28 U.S.C. §§ 2201-2202 (declaratory judgment and injunctive relief).  *See Mountain States Legal Found. v. Bush*, 306 F.3d 1132, 1136 (D.C. Cir. 2002) ("In reviewing challenges under the Antiquities Act, the Supreme Court has indicated generally that review is available to ensure that the Proclamations are consistent with constitutional principles and that the President has not exceeded his statutory authority."); *id*. (judicial review of Presidential action available where "the authorizing statute or another statute places discernible limits on the President's discretion").

5.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(e) because this is an action against the United States and United States agencies and officials and because a substantial part of the events and omissions giving rise to the claims in this case occurred in this District, and the Defendants reside in the District.  Furthermore, the President signed 9564 Proclamation at issue in this case in the District.

## III.  PARTIES

**A.    Plaintiff Association Of O&C Counties**

6.      Plaintiff AOCC is an association whose members are 17 counties in western

Oregon containing O&C Lands managed by BLM ("O&C Counties").  AOCC's members

include Klamath, Douglas, Curry, Coos, Lane, Lincoln, Linn, Polk, Yamhill, Marion,

Clackamas, Multnomah, Columbia, Washington, Tillamook, Jackson and Josephine Counties.

AOCC's sole function is to protect and enhance the O&C Counties' interest in the O&C Lands.

AOCC (then known as the O&C County Courts Association) was a proponent of the legislation

that ultimately became the O&C Act.  AOCC has also participated actively in every significant

administrative or legislative process concerning such lands from 1937 to present.

7.      AOCC's member counties are the intended beneficiaries of the O&C Act.  The

O&C Act expressly provides that AOCC's member counties have the right to 75 percent of gross

receipts from timber sales and harvests on O&C Lands, 43 U.S.C. § 1181f(a), which percentage

since the 1950s has been reduced to 50 percent by periodic Interior Appropriations Acts.  As

such, AOCC's members have a direct financial stake in the validity of Proclamation 9564

because it removes 40,400 acres of O&C Lands from timber production by placing such lands

into the Cascade-Siskiyou National Monument.  The monument designation of these O&C Lands

causes, and will continue to cause, immediate and direct financial harm to AOCC's member

counties by removing timberlands from sustained yield timber production, thereby thwarting the

purpose of the O&C Act.  Proclamation 9564 will necessarily deprive the O&C Counties of the

receipts from timber sales that would otherwise be harvested on those lands each year.

Proclamation 9564 will also necessarily deprive the O&C Counties of timber supply that would

- 4 -

support the wood products industries in those counties, resulting in increased levels of

unemployment, as well as increased demand on certain services provided by the O&C Counties.

8.      The relief requested by AOCC will redress that harm by ensuring that the

Secretary manages the O&C Lands by and through the BLM in accordance with the O&C Act

for the intended purpose of permanent forest production on a sustained yield basis with the

required statutory minimum level of timber harvest.   This relief will ensure that AOCC's

members receive the receipts from timber sales promised by the O&C Act, and will further help

provide for the economic stability and development of the O&C Counties as contemplated by the

O&C Act.

9.      AOCC and its member counties have no other plain, speedy, or adequate remedy

at law.  President Obama's decision to withdraw O&C Lands from sustained yield timber

production and place those lands in the Cascade-Siskiyou National Monument is final, and ripe

for judicial review.

**B.      Defendants**

10.     Defendant Donald J. Trump is the President of the United States of America.

President Trump's predecessor President Obama issued Proclamation 9564 that is the subject of

this lawsuit.  Defendant Kevin Haugrud is the acting Secretary and the official charged with

administering the O&C Act and the Cascade-Siskiyou National Monument through the BLM.

Defendant BLM is responsible for managing O&C Lands and the Cascade-Siskiyou National

Monument.

## IV.  BACKGROUND ALLEGATIONS

### A.    The Antiquities Act Of 1906

11.    The Antiquities Act of 1906 authorizes the President to proclaim national monuments on federal lands that contain "historic landmarks, historic and prehistoric structures, and other objects of historic or scientific interest."  54 U.S.C. § 320301(a).  The President is to reserve "the smallest area compatible with the proper care and management of the objects to be protected."  *Id.* § 320301(b).

### B.    The O&C Act Of 1937

12.    The O&C Act of 1937 mandates that approximately 2.1 million acres of federally-owned land located in eighteen western Oregon counties that have been classified as timberlands, namely the O&C Lands, be managed for permanent forest production on a sustained yield basis, and that between fifty and seventy-five percent of the revenue from the timber sales on such land be paid to the counties in which the land is located, namely the O&C Counties.  43 U.S.C. § 1181a .

13.    The O&C Act was enacted to guide the management of lands that Congress had originally granted to the Oregon and California Railroad (the "Railroad") in connection with the construction of a rail line connecting Portland, Oregon to California.  *See* Act of July 25, 1866, ch. 242, § 1, 14 Stat. 239.  Under the original land grant, as subsequently amended, the Railroad was required to sell the lands in 160-acre parcels at a price of $2.50 per acre to foster settlement and development of the region.  Act of July 25, 1866, ch. 242, § 2, 14 Stat. at 240.  However, the Railroad sold only a small portion of the lands in 160-acre tracts, choosing instead to sell off much larger tracts at prices ranging between $5 and $40 per acre for timber speculation, in direct contravention to the statutory terms of the land grant.  Eventually, in 1903, the Railroad, which

- 6 -

by then had been acquired by Southern Pacific Railroad, withdrew all of the remaining lands from sale, asserting they were timberlands and unsuitable for settlement.

14.     The Railroad's refusal to sell additional O&C Lands had a detrimental impact on the anticipated settlement and development of the O&C Counties and was criticized by local governments.  In response, Congress directed the U.S. Attorney General to enforce the terms of the O&C grant.  *See* S.J. Res. 18, 60th Cong., 35 Stat. 571 (1908).  As a result, the federal government filed suit and obtained a decree forfeiting the unsold O&C Lands back to the United States (causing the railroad to cease making property tax payments on the lands); however, the United States Supreme Court reversed the forfeiture decree and invited Congress to formulate an appropriate remedy.  *Oregon & California Railroad Co. v. United States*, 238 U.S. 393 (1915).

15.     Congress then stepped in again in 1916 by passing the Chamberlain-Ferris Revestment Act (39 Stat. 218), which, among other things, (a) revested all of the unsold lands granted to the railroad back into the United States, (b) directed the Unites States to pay the O&C Counties the unpaid property taxes owed on such lands and (c) directed the Department of the Interior to sell the timber from those lands "as rapidly as reasonable prices [could] be secured" in a normal market.  Chamberlain-Ferris Revestment Act of 1916, ch. 137, § 4, 39 Stat. at 220. Finally, because the O&C Counties would not be able to impose property taxes on the O&C Lands revested in the federal government, the Act also provided that a portion of the revenues from such timber and land sales would be directed to the O&C Counties.  Chamberlain-Ferris Revestment Act of 1916, ch. 137, §§ 9-10, 39 Stat. at 221-22.

16.     But timber sales under the Chamberlain-Ferris Act produced little revenue, causing continued financial hardship to the O&C Counties and eventually leading Congress to

- 7 -

pass the O&C Act in 1937 "to provide the counties in which the O&C land was located with the

stream of revenue which had been promised but not delivered by the Chamberlain-Ferris

Revestment Act." *Headwaters, Inc. v. BLM, Medford Dist.*, 914 F.2d 1174, 1183 (9th Cir.

1990).

17.     To achieve this purpose, the O&C Act mandates that that the O&C Lands be

managed for permanent forest production on a sustained yield basis for the benefit of the O&C

Counties.  Specifically, the O&C Act provides that the O&C Lands

> which have heretofore or may hereafter be classified as
> timberlands, and power-site lands valuable for timber, *shall* be
> managed . . . for permanent forest production, and the timber
> thereon shall be sold, cut, and removed in conformity with the
> principal of sustained yield  for the purpose of providing a
> permanent source of timber supply, protecting watersheds,
> regulating stream flow, and contributing to the economic stability
> of local communities and industries, and providing recreational
> facil[i]ties[.]

43 U.S.C. § 1181a (emphasis added).[1]  In addition, the O&C Act provides that no less than

"[f]ifty per centum" and up to 75 percent of the revenue obtained from such sales shall be

payable "to the counties in which the [O&C] lands revested . . . are situated."  *Id.* § 1181f(a).

18.     In a further effort to ensure a dependable revenue stream to the O&C Counties,

the O&C Act also expressly requires a minimum level of annual timber sales.  At the time of the

enactment of the O&C Act, the best available estimate of the standing timber on O&C Lands

---

[1] As the Ninth Circuit Court of Appeals has held, this language makes "clear that the primary use of the revested lands is for timber production." *O'Neal v. United States*, 814 F.2d 1285, 1287 (9th Cir. 1987).  Thus, while the statute mentions additional benefits of sustained yield timber management such as protecting watersheds and recreation, there is nothing in the statute or its history to "suggest that wildlife habitat conservation or conservation of old growth forest is a goal on a par with timber production, or indeed that it is a goal of the O & C Act at all." *Headwaters, Inc.*, 914 F.2d at 1184.  Instead, timber production is the "dominant use" of the O&C Lands.  *Id.*

- 8 -

was approximately 50 billion board feet and the best estimate of the annual sustained yield was

at least 500 million board feet per year, based on an assumed 100-year rotation period on the

O&C Lands.  This reasoning is reflected in the statute:

> The annual productive capacity for such lands shall be determined
> and declared as promptly as possible after August 28, 1937, but
> until such determination and declaration are made the average
> annual cut therefrom shall not exceed one-half billion feet board
> measure: *Provided,* That timber from said lands in an amount not
> less than one-half billion feet board measure, or not less than the
> annual sustained yield capacity when the same has been
> determined and declared, shall be sold annually, or so much
> thereof as can be sold at reasonable prices on a normal market.

*Id.* § 1181a (underline added).

19.     The purpose of this minimum harvest requirement is also reflected in the

legislative history of the 1937 O&C Act.  The underlined language in the above paragraph was

added to the O&C Act at the insistence of Representative Mott (of Oregon) and the AOCC.  As

originally introduced in H.R. 5858, 75th Cong. (1937), the O&C Act would have provided only

that "[t]he annual productive capacity shall be determined and declared as promptly as possible

after passage of this act, but until such determination and declaration are made, the average

annual cut shall not exceed one-half billion board feet."  While this language plainly capped

harvest in the short term, it provided no minimum cut.  Representative Mott noted this and

objected to any bill that would not provide minimum harvest levels needed to guarantee adequate

revenues for the O&C Counties.  *See* Report of Hearing from April 13, 1937, at 6-8, 25-27, 30.

20.     Similar objections were made by the witness for the AOCC.  Testifying before

Congress, the AOCC's attorney Guy Cordon offered the following language to provide a

minimum cut level:  "Timber from said lands in an amount not less than one-half billion board

- 9 -

feet measure or not less than the maximum annual sustained yield capacity shall be sold annually if the same can be done at reasonable prices on a normal market."  Report of Hearings from May 25, 1937, at 121-22.  Representative Mott and Mr. Cordon both emphasized several times that the intent of the proposed amendment was to limit the Secretary's discretion and to guarantee a minimum harvest level for the benefit of the O&C Counties.  *Id*. at 122-24.

## C.     Implementation Of The O&C Act

21.     Following passage of the O&C Act, the Secretary immediately began to determine the inventory of standing timber and the proper classification of O&C Lands as timberlands or agricultural lands suitable for settlement.  By 1942, the Secretary, through the Department of the Interior, determined that 2,446,000 acres of O&C Lands were properly classified as "timberlands."  U.S. Department of Interior General Land Office, *Forever Timber: Perpetual Sustained Yield Forestry on the Revested Oregon and California Railroad Grant Lands and the Reconveyed Coos Bay Wagon Road Grant Lands in Western Oregon* 17 (1945).

22.     In addition, the Secretary immediately began identifying the annual productive capacity of the O&C Lands and marketing timber from such lands in accordance with the O&C Act.  Starting in fiscal year 1940, the Secretary, through the Department of the Interior, sold 593 million board feet of timber (above the 500 million board feet minimum harvest requirement). W. Horning, U.S. Department of Interior General Land Office, *The O&C Lands and their Management, an Important Advance in Forest Conservation* 7 (Dec. 1940).  Over time, the allowable sale quantities were steadily increased until starting in 1959 the BLM began selling an average of more than 1.1 billion board feet of timber from the O&C Lands every year for the next 32 years, with the peak sale level of 1.662 billion board feet occurring in 1960.  *See* Final Environmental Impact Statement for the Revision of the Resource Management Plans of the

90640331.5 0023461-00003

Western Oregon Bureau of Land Management at 3-239 to -240 (Oct. 2008).

23.     The revenues from such timber sales provided substantial economic benefits to the O&C Counties.  Indeed, in the first 50 years of implementation, the O&C Act returned more than $1.4 billion to the O&C Counties.  Those funds have been used to build and maintain public buildings and construct other public works, and to support basic public services such as law enforcement, corrections, public and mental health services, taxation and assessment, libraries, and a broad array of other services supported by O&C County general fund budgets.

**D.      The United States Previously Determined That O&C Lands Cannot Be Reserved Under The Antiquities Act**

24.     Proclamation 9564 is not the first time that a President has considered incorporating a portion of the O&C Lands into a national monument.  In 1940, President Roosevelt was considering expanding the Oregon Caves National Monument, a 488-acre area in the Siskiyou Mountains.  The contemplated expansion would have included O&C Lands.

25.     The Secretary sought a legal opinion from the Office of the Solicitor as to the whether the President has the authority to set aside O&C Lands "as an addition to the Oregon Caves National Monument."  Solicitor's Opinion M. 30506 (Mar. 9, 1940).  The Solicitor concluded that "[i]t is my opinion that the President does not have such authority."  *Id*.

26.     The Solicitor explained that through the O&C Act,

> Congress directed that certain lands (those heretofore or hereafter classified as timberlands and power-site lands valuable for timber) be managed 'for permanent forest production and the timber thereon shall be sold, cut, and removed in conformity with the principle of sustained yield.'  . . . .  It is clear from the foregoing that Congress specifically provided a plan for the utilization of the Oregon and California Railroad Company revested lands.  The plan among other things involves the disposal of lands and timber and the distribution of the moneys received from such disposition. **It must be concluded that Congress has set aside the lands for**

- 11 -

**the specified purpose.**

*Id*. at 2-3 (emphasis added).

27.     The Solicitor then contrasted this purpose with the management of property under

the Antiquities Act, in which "the disposal of timber in national monuments is restricted" to

insect and disease control.  *Id*. at 3.

28.     Based on that review, the Solicitor concluded that

> [t]here can be no doubt that the administration of the lands for
> national monument purposes would be inconsistent with the
> utilization of the O. and C. lands as directed by Congress.  It is
> well settled that where Congress has set aside lands for a specific
> purpose the President is without authority to reserve the lands for
> another purpose inconsistent with that specified by Congress.  In
> my opinion, therefore, **the President is not authorized to include
> the Oregon and California Railroad Company revested lands
> in the Oregon Caves National Monument**."

*Id*. at 4-5.

29.     The Solicitor has also issued a number of subsequent opinions conforming the

specific purpose of the O&C Lands.  The Solicitor concluded that O&C Lands could not be used

for mining purposes (*see* Department of Interior Memorandum, Aug. 25, 1941), could not be

withdrawn for a state park (*see* Solicitor Opinion, May 17, 1955), and could not be included

within wilderness study areas otherwise required as part of FLPMA (*see* Solicitor Opinion, June

1, 1977).

30.     In addition, in 1986 the Solicitor issued an opinion to the Secretary on the issue of

whether the BLM could develop a program to conserve northern spotted owls on BLM-managed

land.  *See* Solicitor Opinion, Oct. 28, 1986.  The Solicitor concluded that the BLM could develop

such a program consistent with the multiple use provisions of FLPMA.  But that freedom was

"limited" on any O&C Lands because "Congress defined how the Secretary must manage" those

lands under the O&C Act.  The Solicitor explained that the Secretary could establish a program for managing spotted owls on O&C Lands "if it is possible to do so without creating a conflict with the dominant use there – timber production."  *Id*.  However, "[i]f a program for managing northern spotted owls conflicts with producing timber on a sustained basis in O&C timberlands, the O&C Act will preclude the program's application to that realty."  *Id*.

**E.      The Cascade-Siskiyou National Monument**

31.      President Clinton created the Cascade-Siskiyou National Monument under the Antiquities Act by Presidential Proclamation 7318 on June 9, 2000 ("Proclamation 7318). Proclamation 7318 set aside 52,000 acres of federal land.  The proclamation states that "[t]he commercial harvest of timber or other vegetative material is prohibited, except when part of an authorized science-based ecological restoration project aimed at meeting protection and old growth enhancement objectives."  65 Fed. Reg. 37249, 37250 (June 9, 2000).  The proclamation further states that "[n]o portion of the monument shall be considered to be suited for timber production, and no part of the monument shall be used in a calculation or provision of a sustained yield of timber."  *Id.*

32.      Proclamation 7318 placed management of the Cascade-Siskiyou National Monument with the Secretary, through the BLM, and instructed the Secretary to prepare a management plan for the monument.

33.      The current management plan for the Cascade-Siskiyou National Monument was issued in 2008.  As per the instruction in Proclamation 7318, the plan prohibits commercial timber harvest inside the monument.

**F.      President Obama Acts To Expand The Cascade Siskiyou National Monument To Include O&C Lands Despite The United States' Own Prior Determination That O&C Lands Cannot Be Reserved Under The Antiquities Act**

34.      In October of 2016, the BLM released a proposed expansion to the Cascade - Siskiyou National Monument.  The proposed expansion was for 53,100 additional acres, of which 50,900 were O&C Lands.

35.      AOCC sent a letter on October 14, 2016 to the Assistant Secretary explaining that the President lacked the authority to include O&C Lands in the Cascade-Siskiyou National Monument, and cited and provided the 1940 opinion from the Solicitor General.  The letter further explained that the designation would "cut deeply" into the available harvest areas for O&C Lands and would cause significant financial hardship to Klamath and Jackson Counties in particular.

36.      On January 12, 2017, President Obama issued Proclamation 9564, titled Boundary Enlargement of the Cascade-Siskiyou National Monument.  Proclamation 9564 expands the boundaries set by President Clinton in Proclamation 7318, including an additional 48,000 acres.

37.      Proclamation 9564 states that "[a]ll Federal lands and interests in lands within the boundaries" of the monument "are hereby . . . withdrawn from all forms of entry, location, selection, sale, or other disposition under the public land laws."  82 Fed. Reg. 6145, 6148-49 (Jan. 12, 2017).

38.      Proclamation 9654 further states that the Secretary "shall manage the area being added to the monument through the [BLM] as a unit of the National Landscape Conservation System, under the same laws and regulations that apply to the rest of the monument."  *Id.* at 6149.

- 14 -

39.     The effect of this Proclamation is that sustained yield timber production is prohibited on all federal lands within the new portions of the monument, just as they are currently prohibited in the original portions of the monument.

40.     The 48,000-acre expansion includes 42,600 acres in Oregon, of which 40,400 acres are O&C Lands, approximately 95% of the expansion in Oregon.

41.     At least 35,500 acres of those O&C Lands within the new monument are classified as timber lands that must be managed on a sustained yield basis under the O&C Act. As a result of Proclamation 9564, none of those 35,500 acres will be managed for sustained yield timber production as mandated by Congress.

<b>FIRST CLAIM FOR RELIEF</b>

<b>Proclamation 9564 Violates The O&C Act And Exceeds Presidential Authority Under The Antiquities Act By Reserving O&C Lands From Timber Production</b>

42.     Plaintiff re-alleges and incorporates by reference the preceding paragraphs.

43.     Congress set aside the O&C Lands for a specific purpose:  to benefit the O&C Counties.

44.     In accordance with that purpose, the O&C Act requires the Secretary to manage all O&C Lands under the jurisdiction of the Department of the Interior that are classified as timberlands and power site lands valuable for timber for permanent forest production, and the timber thereon shall be sold, cut, and removed in conformity with the principle of sustained yield.  43 U.S.C. § 1181a.

45.     Proclamation 9564 permanently removes at least 35,000 acres of O&C Lands classified as timberlands from sustained yield timber production.  The reservation is inconsistent with and directly contrary to the purpose for which these lands were designated in the O&C Act.

- 15 -

46.     Once Congress sets aside lands for a particular purpose, the President is without authority to reserve those lands for a different purpose.  By reserving O&C Lands for a monument purpose, and prohibiting their use for sustained yield timber production, Proclamation 9564 violates the O&C Act, and exceeds the authority granted to the President in the Antiquities Act.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment as follows:

A.     Adjudge and declare that Proclamation 9564 violates the O&C Act and the Antiquities Act by reserving O&C Lands from sustained yield timber production;

B.     Vacate and enjoin Proclamation 9564 to the extent that it includes O&C Lands;

C.      Award Plaintiff its reasonable attorneys' fees and costs pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412; and

D.     Grant Plaintiff such further relief as may be just, proper, and equitable.

DATED:  February 13, 2017.

                                                                STOEL RIVES LLP


                                                                */s/ Per Ramfjord*
                                                                Per Ramfjord (D.C. Bar No. 392237)
                                                                760 SW Ninth Avenue, Suite 3000
                                                                Portland, OR 97205
                                                                Phone: (503) 294-9257
                                                                Email:  per.ramfjord@stoel.com


                                                                Attorneys for Plaintiff

90640331.5 0023461-00003